# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* | )<br>)<br>)<br>)    Case No.<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

<u>PREMISES TO BE SEARCHED</u>

    The following digital device, ("SUBJECT DEVICE") was seized on or about April 3, 2018, and is currently maintained in the custody of the County of Los Angeles, Department of Coroner in Los Angeles, California: ZTE brand cellular telephone, model: Z3001S, Serial Number: 320683999531, IMEI Number: 990008980531011.

## ATTACHMENT B

### I.  ITEMS TO BE SEIZED

1.  All records relating to violations of Title 18, United States Code, Sections 471 (Making Counterfeit Obligations or Securities of the United States), 472 (Possessing Counterfeit Obligations or Securities of the United States), and Title 21, United States Code, Section 841 (Distribution of a Controlled Substance), (collectively, the "SUBJECT OFFENSES").

a.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

b.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

c.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp Messenger), SMS text, email communications or other text or written communications sent to or received from any digital device.

d.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show use of the internet to access websites or other online
information on the SUBJECT DEVICE related to the detection or
possession of counterfeit currency;

e.    Audio recordings, pictures, video recordings or
still captured images related to the manufacture or possession
of counterfeit currency on phone memory cards, or other storage
contained in the SUBJECT DEVICE;

f.    Data, records, documents, programs, applications
or materials relating to the purchase of any controlled
substances, including ledgers, correspondence, receipts,
records, and documents noting price, quantities, and/or times
when controlled substances were bought, or otherwise
distributed.

g.    Audio recordings, pictures, video recordings or
still captured images on phone memory cards, or other storage
related to controlled substances.

h.    Any SUBJECT DEVICE which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the SUBJECT OFFENSES, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.    evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,

ii

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.  evidence of the times the device was used;

      vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICE

2.    In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

iv

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.    The special procedures relating to the digital device found in this warrant govern only the search of the SUBJECT DEVICE pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Christopher Teschke, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of an application for a search warrant to search a digital device seized on April 3, 2018, and currently in the custody of the Los Angeles County, Department of Coroner (the "SUBJECT DEVICE"), which is described more fully below and in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 471 (Making Counterfeit Obligations or Securities of the United States), 472 (Possessing Counterfeit Obligations or Securities of the United States), and Title 21, United States Code, Section 841(a)(1) (Distribution of a Controlled Substance), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT CHRISTOPHER TESCHKE

3.    I am a Special Agent ("SA") with the United States
Secret Service ("USSS") and have been so employed since July
2016.  I am currently assigned to the counterfeit squad at the
USSS.

4.    I graduated from a twelve-week training course at the
Criminal Investigator Training Program at the Federal Law
Enforcement Training Center in Glynco, Georgia, which included
detailed training in conducting criminal investigations.  I also
completed twenty weeks of training at the USSS SA Training
Course in Beltsville, Maryland, which included detailed training
in the U.S. currency manufacturing process, methods to
distinguish genuine currency from counterfeit U.S. currency, and
tactics/techniques used by individuals involved in the
production of counterfeit currency.

5.    Before I began working with the USSS in 2016, I was a
United States Border Patrol Agent from 2011 to 2016.  In my time
as a Border Patrol Agent, I attended approximately fifteen weeks
of training in Artesia, New Mexico, on among other things, how
to identify different illegal drugs, and methods and practices
used by drug distributors.  As a Border Patrol Agent, I was
involved in numerous arrests of individuals who attempted to
transport illegal drugs across the United States-Mexico border.

6.    Through the course my training and experience, I am
familiar with the ways in which digital devices are used to
facilitate and conceal counterfeiting, financial crimes, and
drug offenses.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On April 3, 2018, Los Angeles Police Department ("LAPD") Officer Hector Velasco conducted a death investigation regarding Jeffery Arand's death.  Based on the evidence and drug paraphernalia found at the scene of Arand's death, Officer Velasco determined that Arand died of a heroin overdose.  During the medical examination of Arand, Investigator Blanchard of the Los Angeles County Department of Coroner found drug paraphernalia related to the use of heroin, a small white baggie with a hard brown substance suspected to be heroin, counterfeit United States Federal Reserve Notes ("FRN") in Arand's pants pocket, and the SUBJECT DEVICE.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    From my review of LAPD and Los Angeles County Department of Coroner investigation reports, my conversations with other law enforcement officers and witnesses, and my own investigation, I know the following:

9.    On or about April 3, 2018, LAPD Officer Velasco responded to a call at 19044 Kittridge Street Apt. 4, Reseda, California regarding a death investigation into Jeffery Arand's death.  Arand was found unresponsive lying on the floor of a condominium bathroom at his friend's apartment.  Arand was pronounced dead by the Los Angeles Fire Department ("LAFD") at 7:41 p.m. after they arrived and failed to revive him.  Officer Velasco and the LAFD Paramedics found a spoon and a syringe sitting on the bathroom vanity in close proximity to Arand.  In my training and experience, I know that heroin users commonly

3

use a spoon and a syringe to inject themselves with heroin. Law enforcement found no evidence that Arand manufactured the heroin, therefore I believe that another individual distributed the heroin to Arand. Additionally, in my training and experience, heroin users typically obtain heroin shortly before they use it.

10. After Arand was pronounced dead, Officer Velasco attempted to notify Arand's next of kin. Officer Velasco was unable to contact any family members of Arand. Officer Velasco then notified the Los Angeles County, Department of Coroner and turned over the death investigation to Investigator Kelli Blanchard.

11. At approximately 9:05 p.m. the same evening, Investigator Blanchard arrived and continued to investigate Arand's death. In the same bathroom where Arand was found dead, Investigator Blanchard saw a metal spoon with brown residue on it, which she believes resembled heroin residue, and a syringe. On the floor of the bathroom, Investigator Blanchard found a cigarette lighter. Based on my training and experience, I know that a cigarette lighters can be used by a heroin user to heat up the heroin on a spoon to make it easier to draw into the syringe and inject into the user's body.

12. In the living room, adjacent to the bathroom where Arand was found, Investigator Blanchard found Arand's black pants. Inside the black pants, she found Arand's State of California I.D. Card, United States FRNs, and a small plastic bag with a brown substance inside, which Inspector Blanchard

thought looked like heroin.  Investigator Blanchard later
discovered that $120 of the United States FRNs appeared to be
counterfeit.  Investigator Blanchard also found Arand's cellular
telephone, the SUBJECT DEVICE, among Arand's personal belongings
in the apartment.

     13.  Pursuant to California Government Code § 27471,
Investigator Blanchard attempted to locate Arand's next of kin
as a coroner in custody of a dead body.  To assist with locating
the next of kin, it is a common practice for death investigators
working for the Los Angeles County, Department of Coroner to
search a deceased person's cellular telephones for the
deceased's next of kin contact information.  As a result,
Investigator Blanchard began looking through the SUBJECT DEVICE
and discovered the following texts in which Arand wrote:

          a.   "W[h]en I see you I'll shoot a few I have like
200 in 20s."

          i.   Based on my training and experience, and on
the $120 in counterfeit in Arand's pants, I understand this to
mean that ARAND has $200 FRNs in $20 denominations.[1]

          b.   "Yeah fer sure I can pass them at food places and
liquor stores.  Or skid row just buy sacks."

          i.   Based on my training and experience, I
understand the discussion about "pass[ing] them" to be referring
to passing counterfeit U.S. FRNs at various locations such as
food places, liquor stores, or at skid row in Los Angeles.  I

---

[1] Arand had $120 in suspected counterfeit FRNs remaining
when he died.

understand the word "sacks" to be referring to purchasing a small amount of drugs, possibly heroin.

14. After seeing text messages regarding possible counterfeit money, Investigator Blanchard decided to take a second look at the U.S. FRNs found in Arand's black pants. Upon a closer examination of the of U.S. FRNs from Arand's black pants, she determined seven of the notes in Arand's possession, totaling $120, appeared to be counterfeit.

15. Law enforcement did not find evidence that Arand had personally created the counterfeit FRNs. Therefore, I believe that Arand likely received the counterfeit FRNs from another individual or from another location.

16. On or about April 4, 2018, Investigator Blanchard called the U.S. Secret Service Los Angeles Field Office to report the counterfeit U.S. FRNs. Investigator Blanchard told me that she believes that she found counterfeit FRNs in Arand's pants pockets. Investigator Blanchard told me that she believes these bills were counterfeit for the following reasons: the color of the ink used to print the image on the note not did not match that of genuine U.S. FRNs, the outside edges where the counterfeit FRNs were cut down to the correct size were not even, the counterfeit FRNs did not contain the security strip that genuine U.S. FRNs have, and many of the counterfeit FRNs contained the same serial number.[2]

---

[2] In my training and experience, I know that genuine U.S. FRNs are cut down to the correct size, all have security strips, and all have unique serial numbers. The fact that the bills Investigator Blanchard was describing did not have these features is consistent with counterfeit FRNs.

17.   Investigator Blanched then told me that the phone number to the SUBJECT DEVICE was (818)471-7115.  Subsequently, Sprint Wireless Communications told me that Arand was the only identified user listed on the account for this phone.

### V.   TRAINING AND EXPERIENCE ON COUNTERFEIT CURRENCY

18.   Based upon my training, experience, and conversations that I have had with other law enforcement officers and/or reports that I have read, I am aware that many criminals who manufacture counterfeit bills today are able to do so with a standard computer, scanner, and color inkjet or multi-function printer.  Based on my training and experience, I am also aware that persons engaged in conspiracies to manufacture and possess counterfeit currency often communicate by cellular telephone calls, text messages, and emails using devices like the SUBJECT DEVICE.  Furthermore, based on my training and experience investigating counterfeiting schemes, I am aware that co-conspirators in such schemes often use cellular telephones similar to the SUBJECT DEVICE to search the internet for information and guidance on the sources of and detection of counterfeit currency.  Additionally, such persons will take photographs of the counterfeit currency and other contraband using devices like the SUBJECT DEVICE.

### VI. TRAINING AND EXPERIENCE REGARDING DRUG DISTRIBUTION OFFENSES

19.   Based on my training and experience and familiarity with investigations into drug distribution conducted by other law enforcement agents, I know the following:

a.   Drug users often contact drug distributors to purchase drugs like heroin.  The aforementioned messages are often maintained on their electronic communication devices such as their cell phones.

b.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people buying drug from drug distributors to have photos and videos on their cell phones of drugs they or others working with them hope to possess, as they frequently receive these photos from drug distributors in an attempt by the drug distributors to boast about the drugs or to facilitate drug sales.

c.   Drug purchasers often keep the names, addresses, and telephone numbers of the source of their drugs on their digital devices.  Drug customers often keep records of meetings with suppliers on their digital devices, including in the form of calendar entries and location data.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

20.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

21. Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

a. Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment. There are so many types of digital
devices and software programs in use today that it takes time to
conduct a thorough search. In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

b. Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.

Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The digital device could contain up to 256 gigabytes or more of storage.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[3] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an

---

[3] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

     e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image

11

as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone

else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

          g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of

devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**VIII.      <u>CONCLUSION</u>**

23.   For all the reasons described above, there is probable cause to believe that the items described in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in a search of the digital device described in Attachment A.


_____
CHRISTOPHER TESCHKE
Special Agent
United States Secret Service


Subscribed to and sworn before me
this \_\_\_\_ day of April, 2018.


_____
UNITED STATES MAGISTRATE JUDGE